# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| CHRISTOPHER HUBBARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 2:17-cv-02452-TLP-tmp |
| v. | ) | |
| | ) | |
| JONATHAN LEBO, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER UPDATING THE DOCKET, DISMISSING PETITION, DENYING CERTIFICATE OF APPEALABILITY, CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Christopher Hubbard[1] petitions for a writ of habeas corpus by a person in state custody under 28 U.S.C. § 2254.  (ECF No. 1.)  Respondent Jonathan Lebo answered (ECF No. 13), and Petitioner replied.  (ECF No. 15.)  After the Court directed Respondent to supplement its answer (ECF No. 24), Respondent submitted an amended answer.  (ECF No. 25.)

Petitioner raises issues falling into three categories: (1) whether the statute of limitations bars Petitioner's claim; (2) whether his claim presents a question of federal law; and (3) whether his claim is procedurally defaulted.  For the reasons discussed below, the Court **DISMISSES** the petition.

---

[1] Petitioner is currently confined at the Whiteville Correctional Facility ("WCF") in Whiteville, Tennessee.  His Tennessee Department of Correction ("TDOC") register number is 168163.  The Court directs the Clerk to update the docket to reflect the current Respondent, WCF Warden Sammy Rogers, and to terminate Warden Jonathan Lebo as Respondent.  The Court also directs the Clerk to update Petitioner's address on the docket.

## BACKGROUND

### I.     State Court Procedural History

On November 18, 2010, a Shelby County Criminal Court jury convicted Petitioner of one count of aggravated kidnapping and one count of aggravated assault.  (ECF No. 12-1 at Page ID 150.)  On January 25, 2011, the trial court sentenced Petitioner as a repeat violent offender to life in prison without the possibility of parole for the aggravated kidnapping conviction, and ten years in prison for the aggravated assault conviction, to be served concurrently.  (*Id.* at PageID 179-80.)  Petitioner appealed (ECF No. 12-1 at PageID 186), and the Tennessee Court of Criminal Appeals ("TCCA") affirmed.  *State v. Hubbard*, No. W2011-01078-CCA-R3-CD, 2012 WL 2196303 (Tenn. Crim. App. June 15, 2012).

On May 30, 2013, Petitioner moved pro se in Shelby County Criminal Court under the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101-122.  (ECF No. 12-15 at PageID 624–30.)  On January 28, 2014, Petitioner's appointed counsel amended the petition and then did so again on June 30, 2014.  (ECF No. 12–15 at PageID 649–65.)  The post-conviction court conducted an evidentiary hearing and denied relief on August 12, 2014.  (ECF No. 12–15 at PageID 666.)  The TCCA affirmed.  *Hubbard v. State*, No. W2014-01716-CCA-R3-PC, 2015 WL 5683092 (Tenn. Crim. App. Sept. 25, 2015).

As for the evidence presented at trial, the TCCA summarized it in the opinion on direct appeal:

> The evidence at trial showed that on Monday, June 8, 2009, the Defendant entered the home of Tarina Moore ("the victim"), savagely attacked her, and left her locked inside her home.  The victim testified that the Defendant was her ex-boyfriend whom she had dated for approximately four years.  On the Saturday night before the incident, the Defendant and the victim attended a house party and returned to the victim's home together.  On Sunday, the victim went to lunch with her children; however, the Defendant was not invited because the victim's children did not get along with him.  The Defendant called the victim later that day and

2

invited her to a barbeque, but she declined the invitation.  The Defendant did not spend Sunday night at the victim's home.

On Monday morning, June 8, 2009, the victim awoke to the Defendant inside her home.  The victim testified that the house had been locked, but she acknowledged that she had previously given the Defendant a key.  The Defendant told the victim that they needed to talk.  The victim said that she laid in bed for another thirty minutes before getting up to speak with the Defendant.  In the meantime, the Defendant paced downstairs and appeared to the victim to be upset.  They began to argue, and the victim left her house to go to a neighbor's house.  The victim could tell that the Defendant was angry, and she wanted to remove herself from the situation before it escalated.  The Defendant had the victim's cell phone in his hand, and the victim planned to use the neighbor's phone to call for help.  However, the neighbor was the Defendant's niece, and she was using her phone and would not let the victim use it.

The Defendant followed the victim into his niece's home.  He pushed the victim onto a bed in a room in the back of the house.  The Defendant wrapped his arm around the victim's neck and his legs around her body.  He began hitting the side of her body.  The Defendant was "hollering and screaming" and telling the victim to "shut up" and that nobody was going to help her.  The Defendant struck the victim about her body and choked her.  He then grabbed the victim by her hair and led her out of his niece's house.

The victim broke away and attempted to run back to her own house.  She planned to beat the Defendant in a footrace to the door and lock him outside.  As she reached her front door, the Defendant caught up to her and pushed his way into her house.  He pushed her into a back room.  The Defendant had left clothes at the victim's house, and he instructed her to put the clothes into a duffle bag.  When she did not do so quickly enough, he punched her so hard that she fell down.  The victim could hear the Defendant talking to someone on the phone and telling that person to come get him.  As he was doing so, the victim again tried to escape, but the Defendant snatched her and threw her on the floor.  He told her that he was going to kill her.

The victim again broke free.  She ran out her back door and to another neighbor's house.  She asked the neighbor to call the police, but the neighbor refused, saying that he did not "want this trouble in [his] house."  The Defendant grabbed the victim, took her out of the neighbor's house, and pushed her back toward her house.  He pushed her on the ground, punching and kicking her all the while.  At one point, the Defendant grabbed the victim's head and slammed it against a wall.  The Defendant threw the victim back into her house, where he continued to assault her.  The victim said that after a final blow, she could not see anything and fell to the floor.  The Defendant grabbed his duffle bag and got into

a green Jeep, which someone had driven to pick him up.  The victim estimated that the attack lasted between two and three hours.[2]

The victim testified that after the Defendant left, she was locked inside her home and could not get out.  She explained that she had double deadbolts on her doors, which required a key to open from either the inside or the outside.  The Defendant had taken the victim's key and had also taken her cell phone, leaving her without a way to call for help.  Upon cross-examination, the victim testified that the windows to her house locked from the inside.  On redirect examination, the prosecutor asked the victim whether she would have been able to get out of the windows, and the victim replied that she could not have "[b]ecause the landlord had these types of locks that you can't—I can't get to them fast enough if I tried to get out of the house."  The victim was then asked whether she could have gotten out of the windows once the Defendant left, and the victim replied that she had not considered doing so.

The victim's daughter, Keayasha Lee, testified that she had been unsuccessfully trying to call her mother's cell phone starting at around 11:30 a.m.  She called approximately ten times and eventually went to the victim's house.  Lee used her key to open the door.  When she did so, she discovered her mother limping, with a black eye and a swollen face.

The victim was taken by ambulance to a hospital where she spent three or four days in the intensive care unit.  Dr. James Langston, a neuroradiologist with the University of Tennessee Medical School, participated in the victim's medical diagnosis and testified at trial.  According to Dr. Langston, the victim suffered a bruise to the scalp and a bruise to the face.  CT scans revealed that the victim suffered bruising on the brain and blood collected between the skull and brain.  Dr. Langston opined that the internal injuries were caused by the victim's brain hitting the inside of her skull.  Photographs were introduced showing the extent of the victim's injuries including a split lip, an eye swollen shut, bruises on the face, arms and shoulders, scratches, bite marks, and hair missing from her scalp.

At the close of the State's proof, the Defendant moved for a judgment of acquittal on both counts.  The trial court denied the motion.  The Defendant elected not to testify and did not offer any proof.  Following deliberations, the jury convicted him of aggravated kidnapping and aggravated assault.

*State v. Hubbard*, 2012 WL 2196303, at *1–*3.

---

[2] In providing specific times, the victim stated that the Defendant woke her up around 8:00 or 8:30 a.m. and left at 10:00 a.m.

The TCCA opinion on post-conviction appeal summarizes the evidence presented at the post-conviction hearing:

> At the evidentiary hearing, trial counsel testified for the Petitioner that he had been practicing criminal law for twenty-two years and worked for the public defender's office.  He said that he and the Petitioner "had a little bit of trouble communicating," that the facts of the case were "pretty bad," and that he tried to show the jury that the victim "had a point of egress" out of her home.  Trial counsel stated that there were "two facets where the jury could find kidnapping."  First, the Petitioner confined the victim to her house.  Second, "when she ran out of the house and she was dragged back in."  Trial counsel did not file a motion for a bill of particulars regarding the kidnapping charge.  He also did not hire an investigator and did not himself investigate the locks on the doors and windows of the home. He and the Petitioner talked about the windows being unlocked but did not discuss how the doors were locked.  The Petitioner told trial counsel that he had lived in the home, and trial counsel did not contact the owner of the property.  Trial counsel said that he researched "the merging or the due process issues" and considered two cases, "*Richardson*" and "*Dickson*."  However, he did not make a due process argument.
>
> On cross-examination, trial counsel testified that he had handled about seventy-five jury trials during his twenty-two-year career.  He said he went over the discovery materials with the Petitioner "[a]s best as [he] could."
>
> Appellate counsel testified for the Petitioner that he began practicing law in 1990 and worked for the public defender's office.  The testimony at trial was that the locks on the victim's doors were "double dead bolt locks, meaning you needed a key from either side to unlock the door, inside or outside."  Counsel said that on direct appeal of the Petitioner's convictions, counsel "tried to make the kidnapping about whether [the victim] was confined in her own home" and that he did not remember the State's making any argument "that she in fact was kidnapped prior to that."  Counsel focused on whether the Petitioner intended to confine the victim in her house.  This court addressed that issue and found the evidence sufficient. Counsel stated that the jury convicted the Petitioner of aggravated kidnapping, not especially aggravated kidnapping, "so that's what we deal with on appeal." Counsel said that aggravated assault was not a lesser-included offense of aggravated kidnapping; therefore, he did not address a double jeopardy issue on appeal.  He said that he also did not think aggravated assault was a lesser-included offense of especially aggravated kidnapping.  Therefore, he also did not address that issue on appeal.
>
> Susan Jones testified for the Petitioner that her son owned a home on Rachel Road in Memphis, that she and her husband managed the property, and that the victim was living in the home in June 2009.  Jones said she was familiar with the locking mechanisms on the doors and windows "at the current time."  She explained

that the home had two front exterior doors:  an outer security door with a "double lock" and an inner wooden door without a double lock.  For the outer security door, a person had to have a key to unlock the door.  The home's rear exterior door also consisted of an outer security door and an inner wooden door.  Jones stated that the rear security door "is not double locked and has full access to anybody who wants to come in or out of the house."  The inner wooden door also was not double locked.

Post-conviction counsel asked if the locks on the doors were any different in 2009, and Jones stated that she had "done some research and looked at our records."  According to the records, the house had "considerable" damage.  Jones said that a damage report "indicated that we replaced one security door."  However, a ledger sheet for actual repairs done on the home did not show that a security door was replaced.  Jones said she also had no memory of replacing a security door.  She then explained as follows:

> [R]eplacing a security door is a fairly major activity and not inexpensive.  So I would say that our ledger sheet reflects accurate information.  We would in doing a damage report, we would err on the side of being financially as careful as possible in terms of security doors in particular.  If we thought that there was damage to a security door and we didn't know whether we could repair it or not, then that damage we would have listed that as possibly one that would have to be repaired.

> . . . .

> The list itself of repairs indicates that we did not do it.  I checked with our principal repair person at that time.  He has no recollection of actually replacing.  We would not replace a door.  You purchase the door.  They come and size it.  They come and replace it.  There is no indication of a replaced door.

Jones acknowledged that she was not "100 percent" positive that the rear security door did not have a double lock in June 2009.  However, nothing indicated that the door had been changed since that time.  Trial or appellate counsel never contacted the Joneses about the locks on the doors.

On cross-examination, Jones testified that she had no personal knowledge about the locks on June 8, 2009.  She acknowledged that according to her records, one of the security doors was damaged.  She stated, "How substantial I don't know, but I would think possibly substantial enough that we would have listed it . . . as replaceable."  She also stated that "I cannot say that it was the back door that we even listed as necessary to replace.  It could have been the front door or the back door."  Upon being questioned by the post-conviction court, Jones clarified that "we listed initially . . . as one of the two doors would be replaced and one would be repaired . . . . [B]ut obviously I have no reason to question our ledger because we

have no reason to adulterate that ledger.  And as a consequence, there's no record of replacing the doors."

On redirect examination, post-conviction counsel asked Jones if her records would have been more accurate or she would have had "better information" about the replacement of the doors if she had been called to testify at trial in 2010.  Jones said that her memory would have been better then but that "[t]hat's all that I could say on that."

The Petitioner testified that the State initially charged him with aggravated assault and that the especially aggravated kidnapping charge "came later."  Trial counsel met with him "a few times, three times at the most" after the State charged him with aggravated assault and "like two times" after the State charged him with especially aggravated kidnapping.  The Petitioner said that he and counsel "couldn't come to an understanding" and that counsel never asked him about the locks on the doors or if the Petitioner could have locked the victim inside her own home.  The Petitioner said that he told trial counsel to take photographs of the locks but that counsel "didn't do nothing."  Upon being questioned by the post-conviction court, the Petitioner said that he did not take the victim's keys and that he had no reason to take the keys because he lived in the home and had his own keys.

Regarding the Petitioner's double jeopardy issues, post-conviction counsel argued that "especially aggravated kidnapping is simply false imprisonment with aggravated assault also occurring.  That is what my argument is based on."  The post-conviction court did not address whether the indicted offenses of especially aggravated kidnapping and aggravated assault violated double jeopardy, instead concluding that the Petitioner was not entitled to relief because the convicted offenses of aggravated kidnapping and aggravated assault were "two separate crimes."  The court stated that the "proof is clear" that the victim suffered serious bodily injury while she was confined and, therefore, that "I don't think there's a double jeopardy issue."  The trial court noted that with regard to the aggravated assault, the victim was beaten "for an extended period of time, resulting . . . in some hospitalization and ICU and bleeding on the brain and there was some serious head trauma."  Regarding the aggravated kidnapping, the post-conviction court recalled that the Petitioner detained the victim, imprisoned her, moved her more than once, and then confined her inside the house.

As to trial counsel's failure to have someone testify about the locks at trial, the post-conviction court noted that the victim

> was clearly questioned about the fact that she was locked in, the doors were locked, she didn't have a key to open those locks, that she didn't have a cell phone to call the police, that she remained inside the house until her daughter came and found her there and the daughter testified she had to open the door to get inside to call the police and seek treatment.

The court found Jones's testimony "informative."  However, the court noted that Jones was not able to say "definitively one way or the other with regard to these doors that they were dead bolted and locked" and stated that "I don't actually know and she can't tell me what she would have said four years ago or five years ago." Thus, the court did not find counsel deficient for failing to call Jones as a witness at trial and denied the petition for post-conviction relief.

*Hubbard v. State*, 2015 WL 5683092, at *3–*6.

## LEGAL STANDARDS

### I.      Standard for § 2254 Petitions

Federal courts have authority to issue habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  § 2254(a).

#### A.      Statute of Limitations

Under 28 U.S.C. § 2244(d),

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall begin to run from the latest of–

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; and

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

§ 2244(d).

## B.      Exhaustion and Procedural Default

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner exhausted available state remedies by presenting the same claim to the state courts under § 2254(b) and (c). *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner must "fairly present"[3] each claim to all levels of state court review, including the state's highest court on discretionary review. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  A petitioner need not seek review by the highest state court, however, if the state has explicitly disavowed state supreme court review as an available state remedy. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999).  Under Tennessee Supreme Court Rule 39, the petitioner need not seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

There is also a procedural default doctrine related to the exhaustion requirement.  *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the

---

[3] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted).  Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

exhaustion rule and the procedural default doctrine).  If the state court decides a claim on an independent and adequate state ground (such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim), the procedural default doctrine ordinarily bars a petitioner from seeking federal habeas review.  *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment") (internal quotation marks and citation omitted).[4]  In general, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule."  *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

If a state court opinion bars a petitioner's claim under the procedural default doctrine, to proceed in federal court, the petitioner must show: (1) cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation; or (2) that a failure to review the claim will lead to a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To show the possibility of a fundamental miscarriage of justice, the petitioner must establish that a constitutional error has probably led to the conviction of a person who is innocent of the crime.  *Schlup*, 513 U.S. at 321; *see also House v. Bell*, 547 U.S. 518, 536–539 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

---

[4] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.  *Walker*, 562 U.S. at 315.  A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed."  *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009)).  "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Id.* (quoting *Kindler*, 558 U.S. at 54) (internal quotation marks and citations omitted).

### C.    Merits Review

Under Section 2254(d), if a Petitioner adjudicated a claim in state court on the merits, a

habeas petition should only be granted if resolving the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  Petitioner carries the burden of proof on this "difficult to meet" and

"highly deferential [AEDPA] standard," which "demands that state-court decisions be given the

benefit of the doubt."  *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102

(2011) and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

When reviewing under § 2254(d)(1), the court is limited to the record before the state

court that adjudicated the claim on the merits.  *Cullen*, 563 U.S. at 181.  A state court's decision

is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the

Supreme Court on a question of law, or "decides a case differently than" the Supreme Court has

"on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13

(2000).  An "unreasonable application" of federal law occurs when the state court "identifies the

correct governing legal principle from" the Supreme Court's decisions, "but unreasonably

applies that principle to the facts of the prisoner's case."  *Id.* at 412–13.  So the state court's

application of clearly established federal law must be "objectively unreasonable" for the writ to

issue.  *Id.* at 409.  And the habeas court may not issue the writ just because, "in its independent

judgment," the court determines that the "state-court decision applied clearly established federal

law erroneously or incorrectly."  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529

U.S. at 411).

11

There is little case law addressing whether, under § 2254(d)(2), a state court based a decision "an unreasonable determination of the facts."  In *Wood v. Allen*, the Supreme Court found that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion."[5]  558 U.S. 290, 301 (2010).  In *Rice v. Collins*, the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."  546 U.S. 333, 341–42 (2006).

The Sixth Circuit described the § 2254(d)(2) standard as "demanding but not insatiable," and emphasized that, under § 2254(e)(1), a court should presume that the state court factual determination is correct absent clear and convincing evidence to the contrary.  *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).  A federal court should not overturn a state court adjudication on factual grounds unless the state court's decision is objectively unreasonable considering the evidence presented during the state court proceeding.  *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

### D.    Ineffective Assistance of Counsel

The standards stated in *Strickland v. Washington* control a claim that ineffective assistance of counsel deprived a defendant of his Sixth Amendment right to counsel.  466 U.S. 668, 687 (1984).  To succeed on this claim, a movant must show that (1) counsel's performance

---

[5] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence."  *Wood*, 558 U.S. at 299.  The Court found it unnecessary to reach that issue, and left it open "for another day."  *Id.* at 300–01, 304 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006), in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) does not apply).

12

was deficient, and (2) "that the deficient performance prejudiced the defense." *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering such a claim must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

To show prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.[6] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. But "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687; *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) (stating that "*Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail, but "places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

---

[6] If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Strickland*, 466 U.S. at 697.

A federal court's deference to a state-court decision under 28 U.S.C. § 2254(d) increases when reviewing an ineffective assistance claim. According to the Supreme Court in *Harrington*,

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

562 U.S. at 105 (internal quotations and citations omitted).

A criminal defendant is entitled to the effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Failure to raise a nonfrivolous issue on appeal does not constitute per se ineffective assistance of counsel, as the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotation marks and citation omitted). Courts evaluate claims of ineffective assistance of appellate counsel using the *Strickland* standards. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (applying *Strickland* to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief); *Murray*, 477 U.S. at 535–36 (failure to raise issue on appeal). To establish that appellate counsel was ineffective, a prisoner

> must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal—that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

*Robbins*, 528 U.S. at 285 (citation omitted).[7]

Appellate counsel's ability to choose which arguments are more likely to succeed is "the hallmark of effective appellate advocacy." *Matthews v. Parker*, 651 F.3d 489, 523 (6th Cir. 2011) (quoting *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003)), *rev'd on other grounds*, 567 U.S. 37, 49 (2012). For that reason, showing that appellate counsel was deficient for raising one issue on appeal, rather than another, is difficult. *See id.* "In such cases, the petitioner must demonstrate that the issue not presented was clearly stronger than issues that counsel did present." *Id.* at 524. The petitioner also must show that "there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

"There is no constitutional right to an attorney in state post-conviction proceedings." *Coleman*, 501 U.S. at 752 (internal citations omitted). As a result, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Id.* What is more, attorney error cannot constitute "cause" for a procedural default, "because the attorney is the

---

[7] The Sixth Circuit has identified a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

1. Were the omitted issues "significant and obvious?"
2. Was there arguably contrary authority on the omitted issues?
3. Were the omitted issues clearly stronger than those presented?
4. Were the omitted issues objected to at trial?
5. Were the trial court's rulings subject to deference on appeal?
6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7. What was the appellate counsel's level of experience and expertise?
8. Did the petitioner and appellate counsel meet and go over possible issues?
9. Is there evidence that counsel reviewed all the facts?
10. Were the omitted issues dealt with in other assignments of error?
11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006) (citation omitted).

petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753 (internal quotation marks omitted). When the state has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754.

In 2012, the Supreme Court decided *Martinez v. Ryan*, which recognized a narrow exception to the rule in *Coleman*, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." 566 U.S. 1, 17 (2012). In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here," and "[i]t does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* at 16. The requirements that a petitioner must satisfy to excuse a procedural default under *Martinez* are:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (emphasis and alterations in original).

In *Martinez*, the Supreme Court considered an Arizona law that did not permit petitioners to raise ineffective assistance claims on direct appeal. *Martinez*, 566 U.S. at 6. In the Supreme

Court's later decision in *Trevino*, the Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ."  569 U.S. at 429.  Thus, *Trevino* modified the fourth *Martinez* requirement for overcoming a procedural default.  Both *Martinez* and *Trevino* apply to Tennessee prisoners.  *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).

## II.     Petitioner's Federal Habeas Claims

Petitioner's § 2254 petition and statement of facts raise four claims.  (ECF Nos. 1 at PageID 5-6 & 1-4 at PageID 33.)  Petitioner's reply raises three new issues.  (ECF No. 15 at PageID 1224–25.)  All in all, the Court construes the § 2254 petition, statement of facts, and reply as raising these issues:

1.     The trial court failed to instruct the jury pursuant to *State v. White*, 362 S.W.3d 559 (Tenn. 2012), in violation of the principles of due process ("Issue 1") (ECF Nos. 1 at PageID 5 & 1-4 at PageID 33);

2.     Petitioner's sentence of life without the possibility of parole violated the Due Process Clause or the Eighth Amendment's prohibition of cruel and unusual punishment ("Issue 2") (*id.* at PageID 33);

3.     Trial and appellate counsel provided ineffective assistance by failing to raise the *White* issue ("Issue 3") (ECF No. 1 at PageID 6); and

4.     Trial counsel provided ineffective assistance by failing to:
   a.     Argue that Petitioner's convictions violated the Double Jeopardy Clause ("Issue 4(a)") (ECF No. 15 at PageID 1224–25);
   b.     Request a change of venue ("Issue 4(b)") (*id.* at PageID 1224); and
   c.     Object to the State's notice of intent to seek enhanced punishment as a Repeat Violent Offender ("Issue 4(c)").  (*Id.* at PageID 1225.)

The TCCA addressed Issue 1 on direct appeal, and Petitioner raised Issue 4(a) in his post-conviction appeal.  *See Hubbard v. State*, 2015 WL 5683092, at *1, *7–*9.  Tennessee courts have not addressed any of the other issues.

<u>**ANALYSIS OF PETITIONER'S CLAIMS**</u>

**I.      Statute of Limitations—Issues 4(a)-(c)**

Respondent contends that the three issues raised for the first time in Petitioner's reply are barred by the statute of limitations.  (ECF No. 25 at PageID 1292–94.)  Petitioner has not responded to this argument and the time for responding has expired.

State convictions ordinarily become "final" under § 2244 (d)(1)(A) when the time expires for petitioning for a writ of certiorari from a decision of the highest state court on direct appeal.  *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000.)  The Tennessee Supreme Court denied permission to appeal on November 21, 2012.  (ECF No. 12-14 at PageID 612.)  So Petitioner's conviction became final on February 19, 2013, the last date for petitioning for writ of certiorari with the United States Supreme Court.

The limitations period ran for eighty-five days until Petitioner tolled the period by mailing his post-conviction petition on May 16, 2013.  (ECF No. 12-15 at PageID 630.)  The Tennessee Court of Criminal Appeals affirmed the dismissal of the post-conviction petition on September 25, 2015.  (ECF No. 12-22 at PageID 1058.)  The statute of limitations began running again on November 24, 2015, the last date Petitioner could have applied for permission to appeal to the Tennessee Supreme Court.

The limitations period ran for 153 more days until Petitioner tolled the period by moving to correct an illegal sentence on April 26, 2016, under Tenn. R. Crim P. 36.1.  (ECF No. 12-23 at PageID 1070.)  On January 20, 2017, the TCCA affirmed the trial court's denial of relief (ECF No. 12-27 at PageID 1140), and on April 13, 2017, the Tennessee Supreme Court denied permission to appeal.  (ECF No. 12-30 at PageID 1185.)  The running of the limitations period started again and Petitioner timely mailed a § 2254 petition and statement of facts on June 21,

2017.  (ECF No. 1 at PageID 14.)  Petitioner had until August 18, 2017, to amend his petition and raise additional claims.  He did not do so.

Under Fed. R. Civ. P. 15(a), a court may freely grant leave to amend when justice so requires.  Courts have interpreted this rule to allow supplementation and clarification of claims first raised in a timely § 2255 motion.  *See Anderson v. United States*, No. 01-2476, 2002 WL 857742, at *3 (6th Cir. May 3, 2002); *Oleson v. United States*, 27 F. App'x 566, 569 (6th Cir. 2001).  Petitioner's reply raises three new claims of ineffective assistance.  (ECF No. 15 at PageID 1217–18.)  But Petitioner did not seek permission to amend his petition and raise these claims before the expiration of the statute of limitations.  And he does not address the statute of limitations in his reply.

"[T]he doctrine of equitable tolling allows federal courts to toll a statute of limitations when a litigant's failure to meet a legally mandated deadline unavoidably arose from circumstances beyond that litigant's control."  *Keenan v. Bagley*, 400 F.3d 417, 421 (6th Cir. 2005) (internal quotation marks omitted), *abrogated on other grounds, Johnson v. United States*, 457 F. App'x 462 (6th Cir. 2012).  The § 2254 limitations period is subject to equitable tolling.  *Holland v. Florida*, 560 U.S. 631, 645–49 (2010).  "[T]he doctrine of equitable tolling is used sparingly by the federal courts."  *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010); *see also Vroman v. Brigano*, 346 F.3d 598, 604 (6th Cir. 2003) (same); *Jurado v. Burt*, 337 F.3d 638, 642 (6th Cir. 2003) (same).  "The party seeking equitable tolling bears the burden of proving he is entitled to it."  *Robertson*, 624 F.3d at 784.  A habeas petitioner is entitled to equitable tolling "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."  *Holland*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

19

Ignorance of the law does not toll the limitations period. *Thomas v. Romanowski*, 362 F. App'x 452, 455 (6th Cir. 2010); *Harrison v. I.M.S.*, 56 F. App'x 682, 685–86 (6th Cir. 2003) (declining to apply equitable tolling where prisoner was ignorant of the filing deadline because, through his other contacts with the court, he "learned that the earlier documents he filed with the court had corresponding filing deadlines" and thus he "knew or should have known that his application for a writ of habeas corpus also had a filing deadline"); *Miller v. Cason*, 49 F. App'x 495, 497 (6th Cir. 2002) ("Miller's lack of knowledge of the law does not excuse his failure to timely file a habeas corpus petition."); *Brown v. United States*, 20 F. App'x 373, 375 (6th Cir. 2001) ("Ignorance of the limitations period does not toll the limitations period."). Here, there is no basis for the Court to toll the one-year statute of limitations. The Court **DENIES** Petitioner's claim because Issues 4(a)-(c) are time barred.

## II. Noncognizable Basis for Relief—Issue 1

Petitioner contends that the trial court's failure to instruct the jury under *State v. White*, 362 S.W.3d 559 (Tenn. 2012), violated the principles of due process. (ECF Nos. 1 at PageID 5 & 1-4 at PageID 33, 36–41.) Respondent replies that the claim fails to allege a violation of federal law. (ECF No. 25 at PageID 1283.) Petitioner fails to acknowledge that *White*[8] was not decided until his case was pending on direct appeal. At the time of trial, the judge had no basis for giving the instruction. The *White* court also held:

---

[8] In *White*, the Tennessee Supreme Court reconsidered the interplay between kidnapping and other felonies with overlapping elements committed as part of the kidnapping. The Tennessee Supreme Court held that a jury instruction which failed to ask the jury to determine whether a victim's removal or confinement was "essentially incidental" to the accompanying felony offense of aggravated robbery violated the defendant's due process rights. *White*, 362 S.W.3d at 577–78. More specifically, the court held that trial courts must ensure that juries return kidnapping convictions only in those times when the victim's removal or confinement exceeds what is necessary to accomplish that felony. *Id.* at 578.

> Our decision, therefore, should not be construed as creating a new standard for kidnapping. Instead, we are merely providing definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty. *Cf. State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992), *superseded by statute on other grounds as stated in State v. Harrell*, No. E2005–01531–CCA–R3–CD, 2007 WL 595885, at *6 (Tenn. Crim. App. Feb. 26, 2007) (defining, for purposes of first-degree murder, the statutory elements of premeditation and deliberation, and holding that "[i]t is consistent with the murder statute and with case law in Tennessee" to instruct the jury accordingly). Furthermore, the change requires the jury to ascertain, in the first instance, whether the movement or confinement of the victim was "essentially incidental" to that which is part of an accompanying offense. In consequence, our ruling does not articulate a new rule of constitutional law or require retroactive application. *Cf. Miller v. State*, 54 S.W.3d 743, 746–47 (Tenn. 2001) (holding that *State v. Brown*'s clarification regarding the definitions of premeditation and deliberation did not announce a new rule of constitutional law, but "simply reiterated that Tennessee law had for many years required proof of both premeditation and deliberation to sustain a conviction of first-degree murder").

*Id.* at 578. The opinion did not rely on any federal case law for this determination. Thus, *White* articulated a new rule of state law, not federal law. *See Fuller v. Barbee*, No. 3:10-cv-01064, 2014 WL 4851671, at *2 (M.D. Tenn. Sept. 29, 2014) (holding that "*White* did not create a new rule of federal law"); *Majors v. Sexton*, No. 3:13-cv-0543, 2013 WL 6148356, at *12 n.3 (M.D. Tenn. Nov. 22, 2013) (noting that "the standard for this Court is whether the conviction violated *federal* due-process standards, not whether it comported with state law"); *Richardson v. Colson*, No. 3:12-cv-409, 2012 WL 2721572, at *8 (M.D. Tenn. July 9, 2012) (holding "*White* articulated a new rule of state law, not federal law").

Petitioner timely requested that the Tennessee Supreme Court review the evidence under *White*, contending that "the removal of the victim, from house to house, was only incidental to the accompanying felony of aggravated assault as defined in" *White*. (ECF No. 12-12 at PageID 593.) This single statement did not "fairly present" the issue as a federal claim to the state appellate courts, as required by *Baldwin v. Reese*. 541 U.S. at 29. The Tennessee Supreme Court acknowledged the TCCA's failure to analyze the effect of instructional error under *White*

but also determined that the trial court's failure to give the instruction was harmless beyond a reasonable doubt.  (ECF No. 12-14 at PageID 612.)

Under 28 U.S.C. § 2254(a), the threshold question in any federal habeas petition is whether the petition claims violations of the Constitution or laws or treaties of the United States.  *See*, *e.g.*, *Tillett v. Freeman*, 868 F.2d 106, 108 (3d Cir. 1989); *Martin v. Solem*, 801 F.2d 324, 331 (8th Cir. 1986); *Nelson v. Solem*, 714 F.2d 57, 60 n.2 (8th Cir. 1983); *Hall v. Iowa*, 705 F.2d 283, 287 (8th Cir. 1983).  If a petition raises federal claims, the court must also determine whether the state court had a chance to review those claims.  *Harless*, 459 U.S. at 6.

Petitioner did not "fairly present" this issue as a federal claim to the state appellate courts, as *Baldwin* required.  541 U.S. at 29.  Instead, he presented the claim as an error under Tennessee law.  Petitioner's argument here relies solely on Tennessee state cases.  (ECF No. 1-4 at PageID 36–41).  What is more, he fails to identify Supreme Court precedent supporting  his claim here.  That claim being that the federal Due Process Clause requires a trial court to have instructed a jury consistent with the *White* decision while presiding over a case <u>before</u> the Tennessee Supreme Court even decided *White*.  The Court **DENIES** Petitioner's claim because Issue 1 presents no cognizable basis for relief.

## III.    Procedural Default—Issue 2

Petitioner contends that the trial court violated the Due Process Clause or the Eighth Amendment's prohibition of cruel and unusual punishment by sentencing him to life without the possibility of parole.  (ECF No. 1-4 at PageID 33.)  Respondent replies that the procedural default doctrine bars this claim because Petitioner failed to raise and exhaust the claim in state court.  (ECF No. 25 at PageID 1288.)

The court could have sentenced Petitioner to life without parole on the aggravated kidnapping conviction because of his earlier conviction for second-degree murder. (ECF No. 12-2 at PageID 311–18.) The jury determined beyond a reasonable doubt that Petitioner had an earlier conviction for second-degree murder. (*Id.* at PageID 321.)

Petitioner did not properly exhaust this claim here by presenting it to the TCCA. Instead, Respondent is correct. The procedural default doctrine bars Petitioner's Issue 2. And he has no avenue remaining for presenting that claim because of the state statute of limitations on state post-conviction relief. This procedural default operates as a complete and independent procedural bar to federal habeas review of this claim. *Martinez* provides no basis for excusing the default of this issue because it is not a claim of ineffective assistance of trial counsel. The Court therefore **DENIES** Petitioner's claim because Issue 2 is barred by procedural default.

## IV.    Ineffective Assistance of Counsel—Issue 3

Petitioner contends that trial and appellate counsel provided ineffective assistance by failing to raise the *White* jury instruction issue. (ECF No. 1 at PageID 6.) Respondent replies that the procedural default doctrine bars this claim too because Petitioner did not raise it in state court. (ECF No. 25 at PageID 1291.)

Petitioner did not raise this issue in his pro se petition for post-conviction relief (ECF No. 12-15 at PageID 637–38). Nor did his counsel in the amended petitions. (*Id.* at PageID 651–58, 661–64.) Petitioner also did not raise the issue during the post-conviction hearing (ECF No. 12-16), and he never presented the claim to the TCCA. So the procedural default doctrine bars Issue 3 too. And there is no avenue remaining for presenting the claim given the state statute of limitations on state post-conviction relief. This procedural default operates as a complete and independent procedural bar to federal habeas review of this issue.

23

If Petitioner relies on *Martinez* to show cause and prejudice for the default of this claim, he argues that post-conviction counsel provided ineffective assistance by failing to identify and raise the issue.[9]  But under *Martinez*, ineffective assistance of post-conviction counsel does not create cause to excuse the procedural default of a claim of ineffective assistance of appellate counsel.  *See Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) (*"*Under *Martinez*'s unambiguous holding our previous understanding of *Coleman* in this regard is still the law—ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel.").  This Court finds no reason to extend the limited holding in *Martinez* to claims other than ineffective assistance of trial counsel.[10]  The Court finds that Issue 3 is also barred by procedural default.

Petitioner's claims lack merit.  Either the statute of limitations or the procedural default doctrine bars his claims here.  The Court therefore **DISMISSES** the petition **WITH PREJUDICE**.  The Court will enter judgment for Respondent.

## APPELLATE ISSUES

A petitioner is not always entitled to appeal a district court's denial of a § 2254 petition.  *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003).  The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.  *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.  A petitioner may not appeal unless a circuit or district judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

---

[9] No basis exists for the claim of ineffective assistance of trial counsel.  *White* was decided after Petitioner's trial.

[10] Petitioner fails to establish that—had direct appeal counsel raised a *White* claim—counsel would have achieved a result other than the Tennessee Supreme Court's ruling that the court's failure to issue the instruction was harmless error.

The court may issue a COA only if the petitioner made a substantial showing of the denial of a constitutional right, and the COA must reflect the specific issue or issues that satisfy the required showing.  28 U.S.C. §§ 2253(c)(2)-(3).  A petitioner makes a "substantial showing" when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must show that reasonable jurists could disagree with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed even more).

Nor does the petitioner have to show that the appeal will succeed.  *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011) (same).  But courts should not issue a COA as a matter of course.  *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Miller-El*, 537 U.S. at 337).

Here, the statute of limitations bars Petitioner's claims.  What is more, his other claims are noncognizable and barred by procedural default.  Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court **DENIES** a certificate of appealability.

For the same reasons, the Court **CERTIFIES** under Fed. R. App. P. 24(a) that any appeal here would not be taken in good faith.  Thus, the Court **DENIES** leave to appeal in forma pauperis.[11]

---

[11] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or move to proceed in forma pauperis and supporting affidavit in the Sixth Circuit within 30 days of the date of entry of this order.  *See* Fed. R. App. P. 24(a)(5).

**SO ORDERED**, this 25th day of September, 2020.

s/Thomas L. Parker
_____
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE